United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8               IN THE UNITED STATES DISTRICT COURT

9               FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  MI PUEBLO SAN JOSE, INC and
    CHA CHA ENTERPRISES, LLC,              No   C-06-4094 VRW

12          Plaintiffs,                        ORDER

13          v

14  CITY OF OAKLAND,

15          Defendant.
    _____/
16

17

18          On June 30, 2006, Mi Pueblo San Jose, Inc and Cha Cha

19  Enterprises, LLC, filed suit against the City of Oakland, seeking

20  declaratory and injunctive relief and damages pursuant to the

21  Fourteenth Amendment to the United States Constitution, 42 USC §

22  1983, 42 USC § 1981, California Government Code § 6250, et seq, and

23  Oakland Municipal Code § 2.20, Article III.  Doc #1.  The City has

24  moved to dismiss pursuant to FRCP 12(b)(6).  Doc #20.  For reasons

25  discussed below, the City's motion is DENIED.

26  //

27  //

28  //

**United States District Court**

For the Northern District of California

I

"On a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." Wyler Summit Partnership v Turner Broadcasting System, Inc, 135 F3d 658, 661 (9th Cir 1998) (citing Parks School of Business, Inc v Symington, 51 F3d 1480, 1484 (9th Cir 1995)).  Accordingly, what follows is drawn from plaintiffs' complaint (Doc #1), taking their allegations as true.

In early 2005, Cha Cha Enterprises, LLC, on behalf of related entity, Mi Pueblo San Jose, Inc, entered into a twenty-year lease of a commercial building located at 1630 High Street in Oakland, California with owner Red Mountain Retail Group, Inc.  Doc #1, ¶ 3-4, 7-8.

Cha Cha leased the property as the location for a full-service grocery store to be operated by Mi Pueblo.  Doc #1, ¶ 8. The lease provided for Mi Pueblo to make tenant improvements to the property which, at the time the parties executed the lease, housed a vacant grocery store.  Id.  On July 22, October 3 and December 16, 2005, Mi Pueblo applied for, and the City of Oakland issued, all building permits necessary for the proposed improvements.  Id at ¶ 10.  Soon thereafter, Mi Pueblo began improvements in preparation for its scheduled June 18, 2006, opening.  Id.

On February 10, 2006 the City notified Mi Pueblo's landlord, Red Mountain, that pursuant to an "existing nonconformity," the property was subject to a "[m]ajor [c]onditional [u]se [p]ermit."  Doc #1, ¶ 13.  On February 23, 2006, Red Mountain filed an appeal of the City's determination.  Id at ¶ 16.  Approximately one month later, during a meeting between

United States District Court

For the Northern District of California

the City and Red Mountain, the City explained that the "existing nonconformity" was due to Mi Pueblo's lack of a valid liquor license.  Id at ¶ 17(a) and (b).  After Red Mountain assured the City that, as of September 16, 2005, Mi Pueblo held the requisite license, the City agreed to retract the "nonconforming" categorization of the property.  Id at ¶ 11, 17(c) and (d).  Based on the City's agreement, Mi Pueblo continued construction in anticipation of its scheduled June 18, 2006, opening.  Id at ¶ 20.

One week after the City's meeting with Red Mountain, the City, through the City Council President, issued a press release calling for a "[p]rotest of Mi Pueblo []," by "[u]nions, [n]eighbors, [and] [m]erchants."  Doc #1, ¶ 19.  In its release the City referred to Mi Pueblo as the "Wal-Mart of the Latino [c]ommunity."  Id.

On April 26, 2006, contrary to the City's promise to retract the nonconforming categorization, the City notified Red Mountain that it would hear the appeal regarding the nonconforming use on June 21, 2006.  Doc #1, ¶ 21.  The City further notified Red Mountain that Mi Pueblo's work constituted an "unauthorized expansion of an alcoholic beverage sales establishment in violation [of] Oakland Municipal Code," revoked all previously issued building permits due to a violation of Oakland Municipal Code § 17.11 (pertaining to open space zoning regulations), and ordered Red Mountain to "immediately cease and desist all construction and demolition work," as all permits were issued "in error."  Id at ¶ 21-22.  The order instructed Red Mountain to direct any questions to the City Attorney's office.  Id at ¶ 23.

//

United States District Court

For the Northern District of California

1    Despite the City's knowledge of Mi Pueblo's improvements,
2  the City failed to notify Mi Pueblo of the revocation until several
3  days later, when it "red tag[ged]" the property.  Doc #1, ¶ 23-24.
4  Upon notification, Mi Pueblo immediately ceased all construction.
5  Id at ¶ 24.

6    Pursuant to the April 26, 2006, revocation of permits and
7  order to cease construction, Red Mountain and Mi Pueblo repeatedly
8  contacted the City Attorney's office to appeal the decision.  Doc
9  #1, ¶ 26.  The City Attorney's office directed Mi Pueblo to
10 numerous city attorneys, the city development director, various
11 city departments and officials, and eventually to outside counsel.
12 Id at ¶ 25.  During these exchanges, the only concrete information
13 Mi Pueblo obtained was from the City's building official, who told
14 Mi Pueblo that the matter was a "special situation," and that the
15 only possible recourse was through the City Attorney's office.  Id
16 at ¶ 26.  Moreover, the City repeatedly denied Mi Pueblo's attempts
17 to access the public file regarding the status of its permits.  Id
18 at ¶ 27.

19   Mi Pueblo continued to pursue the matter via numerous
20 telephone calls and letters to the City Attorney's office.  Doc #1,
21 ¶ 25, 28-30.  Following over two months of correspondence which
22 produced no substantive response from the City, plaintiffs filed
23 this action seeking declaratory and injunctive relief and damages
24 pursuant to the Fourteenth Amendment to the United States
25 Constitution, 42 USC § 1983, 42 USC § 1981, California Government
26 Code § 6250, et seq, and Oakland Municipal Code § 2.20, Article
27 III.  Doc #1.
28 //

4

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II

FRCP 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." Scheid v Fanny Farmer Candy Shops, Inc, 859 F2d 434, 436 (6th Cir 1988). FRCP 8(a), which states that a plaintiff's pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," provides the standard for judging whether such a cognizable claim exists. Lee v City of Los Angeles, 250 F3d 668, 679 (9th Cir 2001). This standard is a liberal one that does not require a plaintiff to set forth all the factual details of the claim; rather, all that the standard requires is that a plaintiff give the defendant fair notice of the claim and the grounds for making that claim. Leatherman v Tarrant County Narcotics Intell & Coord Unit, 507 US 163, 168 (1993) (citing Conley v Gibson, 355 US 41, 47 (1957)). To this end, a plaintiff's complaint should set forth "either direct or inferential allegations with respect to all the material elements of the claim". Wittstock v Van Sile, Inc, 330 F3d 899, 902 (6th Cir 2003).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Hughes v Rowe, 449 US 5, 9 (1980) (citing Haines v Kerner, 404 US 519, 520 (1972)). See also Conley, 355 US at 45-46. All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See In re Silicon Graphics Inc Sec Litig, 183 F3d 970, 980 n10 (9th Cir 1999). The court may also consider documents

**United States District Court**

For the Northern District of California

attached to the complaint in connection with a FRCP 12(b)(6) motion to dismiss.  <u>Parks School of Business, Inc v Symington</u>, 51 F3d 1480, 1484 (9th Cir 1995).  The court may not, however, consider other documents outside the pleadings.  <u>Arpin v Santa Clara Valley Transp Agency</u>, 261 F3d 912, 925 (9th Cir 2001).

III

A

The City contends that plaintiffs' claims brought under 42 USC §§ 1983 and 1981 fail because plaintiffs have not alleged any injury caused by an official policy of the City.  Doc #20 at 4. Instead, plaintiffs' claims are said to arise from "isolated or sporadic incidents," which, the City argues, cannot form the basis for section 1983 liability.  Furthermore, the City argues the allegations concerning City Council President De La Fuente are insufficient to impute liability, because there are no allegations that he is a final policymaker for defendant.

Under <u>Monell v Department of Social Services</u>, municipal liability must be based upon enforcement of a municipal policy or custom that caused the deprivation of the plaintiffs' federal right, and not upon the municipality's mere employment of a constitutional tortfeasor.  436 US 658 (1978).  "The 'official policy' requirement * * * intend[s] to distinguish acts of the municipality from acts of employees in order to limit municipal liability to conduct for which the municipality is actually responsible."  <u>Pembaur v Cincinnati</u>, 475 US 469, 478 n6 (1986).  As relevant here, municipal liability under this requirement may be premised upon (1) a single decision by an official with final

decisionmaking authority or (2) a custom or persistent practice.

For a single decision to trigger liability, it must come from an official with final decisiomaking authority; mere authority to exercise discretion in the course of implementing a municipal policy is insufficient.  <u>Pembaur</u>, 475 US at 483.  "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."  <u>City of St Louis v Prapotnik</u>, 485 US 112, 127 (1988).  But if the authorized policymakers approve a subordinate's determination and the basis for it, "their ratification [is] chargeable to the municipality because their decision is final."  Id.  Whether an official has final decisionmaking authority is decided by reference to state and local law.  485 US 112 (1988).  Yet in <u>Bouman v Block</u>, the Ninth Circuit noted that deciding whether a municipal entity delegated final decisiomaking authority to a particular official often presents factual issues.  940 F2d 1211 (9th Cir 1991).

In the present case, plaintiffs allege that the following city officials were involved in the decision to revoke plaintiffs' building permits:  the acting interim chief building official, the City Council President, the attorneys in the City Attorney's office and the City's development director.  Doc #1, Complaint at ¶ 22, 23, 25, 26, 28, 29 and 30.

The City appears to argue that plaintiffs' claims require dismissal because plaintiffs cannot specifically identify who among the City's cast of characters actually retained final decisionmaking authority regarding the building permits.  The court

**United States District Court**

For the Northern District of California

**7**

United States District Court

For the Northern District of California

1    disagrees.  Under the City's reasoning, a municipality could avoid

2    liability by obscuring its organizational structure and suggesting

3    that the buck stops nowhere.  But this, thankfully, is not the law.

4    Rather, for dismissal of plaintiffs' claims, the City must

5    demonstrate that the complaint presents a situation in which no

6    final policymaker revoked the permits or approved a subordinate's

7    decision to revoke them.  Hence, it is not enough for the City to

8    hide behind its apparently circuitous chain of command.

9         The City also asserts that "[a]ny suggestion that

10   [Councilmember De La Fuente] intervened in the process is pure

11   speculation."  This disregards the proce3dural posture of the case:

12   plaintiffs need not prove every assertion to bring suit or to

13   survive a Rule 12(b)(6) motion to dismiss.  To the contrary, all

14   material allegations in the complaint must be taken as true and

15   construed in the light most favorable to plaintiffs.  See In re

16   Silicon Graphics Inc Sec Litig, 183 F3d 970, 980 n10 (9th Cir

17   1999).  Moreover, considering City Council President De La Fuente's

18   press release issued on April 5, 2006, asking "[u]nions,

19   [n]eighbors, [m]erchants" to "[r]ally in [p]rotest of Mi Peublo

20   [m]arket," Doc #1, Ex I, the proposition that he intervened in the

21   permit process two weeks later is hardly implausible.  In any

22   event, this is precisely the kind of allegation that requires

23   discovery.

24        Section 1983 municipal liability may also be premised

25   upon enforcement of a well-settled municipal custom or practice,

26   even though the custom or practice has not been embodied in a

27   formally promulgated policy, such as an ordinance or regulation.

28   Adickes v S H Kress & Co, 398 US 144, 167-68 (1970).  Isolated

United States District Court

For the Northern District of California

instances of wrongdoing by municipal officers or employees do not constitute a custom, but a series of acts violative of constitutional rights will in many cases raise an inference of municipal policy.  Gomez v Vernon, 255 F3d 1118 (9th Cir 2001).  Whether a practice is sufficiently persistent to constitute custom depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct.  See Schwartz, Section 1983 Litigation, § 7.16.  The rank or importance of the municipal actor would also appear to figure in this calculus.

Plaintiffs argue that their dispute with the City itself constitutes a custom or practice.  That an incident comprises multiple events does not necessarily render it a custom or practice.  Instead, plaintiffs need to show that the underlying incident — the illegal revocation of building permits — is itself a custom or practice of the City vis-à-vis other land owners or represents a practice specifically directed at plaintiffs.  Plaintiffs' allegation regarding the involvement of a final decisiomaker is sufficient to survive a Rule 12(b)(6) motion.

Finally, the City argues that the availability of a post-deprivation remedy precludes plaintiffs' due process claims under Parrat v Taylor, 451 US 527 (1981) and Hudson v Palmer, 468 US 517 (1984).  The City identifies its administrative appeals process and the writ of administrative mandamus provided by state law, Cal Code Civ Pro § 1094.6, as alternative remedies.

The Parratt issue arises when a section 1983 plaintiff alleges a violation of procedural due process and the defendant asserts that the available state judicial remedies provide all the

United States District Court

For the Northern District of California

process that is due.  The *Parratt* doctrine holds that an adequate post-deprivation state judicial remedy satisfies procedural due process when the deprivation of property is the product of a "random and unauthorized act" rather than enforcement of an "established state procedure."  451 US 527 (1981).

In *Hudson*, a prisoner alleged that, during a search of his prison cell, a guard deliberately and maliciously destroyed some of his property, including legal papers.  468 US at 534-35. The Court blocked § 1983 liability due to the availability of a tort remedy by which the prisoner could have been compensated.  Id. In *Hudson*, as in *Parratt*, the state official was not acting pursuant to any established state procedure, but, instead, was apparently pursuing a random, unauthorized personal vendetta against the prisoner. Id at 521, n2, 532.

Yet in *Zinermon v Burch*, 494 US 113 (1990) — a case neither party cites — the Court subsequently scaled back *Parratt* and *Hudson*.  In *Zinermon*, the Court noted that *Parrat* and *Hudson* only apply "to the unusual case in which * * * the value of predeprivation safeguards is negligible in preventing the kind of deprivation at issue."  494 US at 129.  The Court concluded that *Paratt* and *Hudson* do not apply if:  (1) the deprivation of property was not unpredictable, (2) a pre-deprivation process was not impossible and (3) the improper conduct was not "unauthorized."

In the present case, unlike the situation in *Parrat* and *Hudson*, the City is able to predict when it will revoke permits. Moreover, a pre-deprivation process is far from "impossible," *Zinermon*, 451 US, at 541; to the contrary, the City already requires certain procedural safeguards for limiting the power to

revoke permits.  Finally, the deprivation here is not
"unauthorized" because the City provided the authority to effect
the very deprivation complained of here, the revocation of
plaintiffs' building permits.

In sum, the court disagrees with the City's contention
that plaintiffs' section 1983 and 1981 claims require dismissal for
failure to allege an injury caused by an official policy of the
City.

B

Next, the City argues that plaintiffs' due process claims
are not ripe because (1) plaintiffs have not obtained a final
decision resulting in the deprivation of a protected property
interest and (2) plaintiffs have not availed themselves of any
post-deprivation procedures under state law.

In support of the City's assertion that a final decision
is a prerequisite for a procedural due process claim, the City
cites Williamson County Regional Planning Comm'n v Hamilton Bank of
Jackson City, 473 US 172 (1985).  In that case, a land owner's
claims against a zoning law were not ripe because he failed to
apply for appropriate variances under municipal law before
embarking on takings and due process claims.  Plaintiffs respond
that, unlike the situation in Williamson County, their ability to
appeal the zoning decision was thwarted by the municipal authority.
Doc #24 at 10.

Yet both parties are mistaken to focus on Williamson
County.  Were this a regulatory takings case, plaintiffs most
likely could not have brought suit until the appropriate

11

administrative body rendered a final decision on plaintiffs'

appeal.  Williamson County established a heightened ripeness

standard for takings cases because such cases are "fact-intensive,

and require a careful examination of the challenged decision's

economic impact and the extent to which it interferes with

reasonable investment-backed expectations."  Triple G Landfills,

Inc v Board of Commissioners, 977 F2d 287, 289 (7th Cir 1992)

(explaining why a final decision is not necessary for challenging

permit requirements).  Accordingly, the Ninth Circuit requires a

final decision for a due process claim if it relates to, or arises

from, a taking claim.  See Norco Construction, Inc v King County,

801 F2d 1143 (9th Cir 1986).  Otherwise procedural due process

claims are not subject to heightened ripeness constraints.

Carpinteria Valley Farms, Ltd v County of Santa Barbara, 344 F.3d

822, 831 (9th Cir 2003) ("Thus * * * claims under 42 USC § 1983

concerning land use may proceed even when related Fifth Amendment

'as applied' taking claims are not yet ripe for adjudication.").

See also Harris v County of Riverside, 904 F2d 497, 500-01 (1990).

Here, plaintiffs' due process claims do not relate to or arise from

a taking claim; hence, the standard ripeness test is appropriate.

          "The ripeness doctrine is drawn both from Article III

limitations on judicial power and from prudential reasons for

refusing to exercise jurisdiction."  Nat'l Park Hospitality Ass'n v

DOI, 538 US 803, 808 (2003) (internal quotation marks omitted).  To

satisfy the constitutional requirement, there must exist a case or

controversy, with issues that are "definite and concrete, not

hypothetical or abstract."  Thomas v Anchorage Equal Rights Comm'n,

220 F3d 1134, 1139 (9th Cir 2000) (en banc) (internal quotation

marks omitted) (quoting <u>Railway Mail Ass'n v Corsi</u>, 326 US 88, 93 (1945)). Moreover, ripeness "is peculiarly a question of timing. [Its] basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." <u>Thomas v Union Carbide Agric Prods Co</u>, 473 US 568, 580 (1985) (citation omitted) (omission in original).

The prudential aspect of ripeness is considered in a two prong test: first, whether the relevant issues are sufficiently focused so as to permit judicial resolution; and, second, whether the parties would suffer any hardship by the postponement of judicial action. <u>Abbott Laboratories v Gardner</u>, 387 US 136, 149 (1967). The Supreme Court has explained that the rationale behind the prudential aspect of the ripeness doctrine is to "protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Id at 148-49.

The first factor is inconclusive in the present case. On the one hand, this litigation would interfere with the City's administrative procedures because plaintiffs have not been able to appeal. But, on the other hand, in revoking the building permits and impinging plaintiffs' efforts to appeal, the City's administrative decision was formalized and its effects concretely imposed on plaintiffs.

The City asserts that <u>Manufactured Home Communities, Inc v City of San Jose</u>, 420 F3d 1022 (9th Cir 2005), controls this issue. In <u>MHC</u>, a landlord's claims were held to be unripe because he did not first attempt to raise rent through administrative procedures. In its decision, the Ninth Circuit emphasized that MHC

13

United States District Court

For the Northern District of California

1  "never engaged in the administrative process."  Id at 1033.  Hence,

2  the court reasoned, "[d]ue process has not been denied because no

3  process was pursued."  Id.  But unlike the situation in MHC,

4  plaintiffs have extensively pursued the City's complex permit

5  procedures.  This case is not made unripe simply because the City

6  can point to a few stones unturned.

7        The second factor, hardship to the parties of delaying

8  review, clearly weighs in plaintiffs favor.  Plaintiffs were in the

9  midst of construction when the permits were revoked.  And

10 plaintiffs continue to wait in legal limbo, all the while they

11 remain liable for $37,600 per month in rent.  This situation

12 demonstrates that plaintiffs have a direct, tangible and not merely

13 a hypothetical interest in the subject matter of this litigation,

14 Abbott Laboratories, 387 US at 153-54, for the revocation

15 categorically prohibits plaintiffs from following through with its

16 current plans.

17        Accordingly, the court concludes that plaintiffs'

18 procedural due process claims are not unripe.

19

20                                 C

21        The City contends that plaintiffs have not pled race

22 discrimination under section 1981 with sufficient particularity.

23 As such, the City urges the dismissal of plaintiffs' claim for

24 intentional discrimination on the basis of race or national origin

25 due to insufficient factual allegations.

26        The City argues that plaintiffs' section 1981 claims rest

27 solely on the alleged statement of City Council President De La

28 Fuente. Based on Kawaoka v City of Arroyo Grande, 17 F3d 1227 (9th

1  Cir 1994), the City argues that use of a racial epithet is

2  insufficient to state an intentional discrimination claim against

3  the City of Oakland as a matter of law.  Yet <u>Kawaoka</u> is not

4  determinative here because it was a decision for summary judgment

5  and dealt with off-duty remarks.  Id.

6        Even though a plaintiff's allegations are deemed admitted

7  for purposes of a motion to dismiss, these allegations may not be

8  mere legal conclusions.  Plaintiff must plead an "overt act which *

9  * * gives substance to his claim of discrimination and takes it

10  from the realm of purely unsupported conclusory allegations."

11  <u>Sherman v Yakahi</u>, 549 F2d 1287, 1290 (9th Cir 1977).  See also

12  <u>Jones v. Community Redevelopment Agency</u>, 733 F2d 646 (9th Cir 1984)

13  (finding insufficient plaintiffs' allegations that he had been

14  deprived of the right to bid on government contracts without any

15  allegations regarding how "race" entered into the decision making

16  process or any mention of contracts for which he applied and was

17  denied).

18        In the instant action, plaintiffs' broadly allege the

19  following:

20        [T]he City intentionally discriminated against plaintiffs
        by, among other things, revoking the building permits,
21        failing to make any remedy or recourse available to
        plaintiffs to address the City's actions, and denying
22        plaintiffs access to public records for no valid reason,
        based on the race and national origin of plaintiffs'
23        principal owners. Doc #1, Complaint, ¶ 75.

24  The lone specific allegation is a statement by City Council

25  President De La Fuente, calling on small business owners, unions and

26  neighbors to "protest the Wal-Mart of the Latino [c]ommunity."  Id

27  at ¶ 75, Ex I.

28        Although minimal, the factual allegations in the complaint

United States District Court

For the Northern District of California

are sufficient to survive the City's 12(b)(6) motion.  Section 1981 does not necessarily require that the plaintiffs' ethnic characteristics be the source of the alleged discrimination.  The only requirement is that the discrimination be in fact motivated by racial considerations.  See <u>Alizadeh v Safeway Stores, Inc</u>, 802 F2d 111 (5th Cir 1986) (permitting a white female to claim discrimination due to her marriage to an Iranian male).  Here, plaintiffs appear to allege that City Council President De La Fuente discriminated against Mi Pueblo and its owners for betraying their Latino roots.  This prejudice led De La Fuente to saddle Mi Pueblo with bureaucratic red-tape he would not impose on a non-minority grocery store.  See Doc #24 at 11 n7 ("Plaintiffs believe that the City and Council President De La Fuente would have little opposition if a Safeway, Whole Foods or Andronicos sought to occupy the former Albertsons location").

       An alternative theory suggested by plaintiffs is that City Council President De La Fuente discriminated against Mi Pueblo for not being authentic compared to the "small mom-and-pop" Latino stores scattered throughout the City of Oakland.  Some commentators term this phenomenon the "trap of cultural authenticity," which describes the tendency of certain minority cultural traits to become, in effect, canonized and for the authorities of that culture to demand its members to comply with these traits or face exclusion for being inauthentic.  See Richard T Ford, <u>Racial Culture:  A Critique</u>.  As applied here, De La Fuente viewed Mi Pueblo as an inauthentic Latino store for operating like Wal-Mart, rather than conforming to the standard mold.  Although this alternative theory may run afoul of Supreme Court instruction that section 1981

16

United States District Court

For the Northern District of California

proscribes "intentional discrimination solely because of [a person's] ancestry or ethnic characteristics," <u>Al-Khazraji v Saint Francis College</u>, 481 US 611, 613 (1987), it is sufficient to survive a Rule 12(b)(6) motion.

By contrast, the City's argument attempts to convert this motion to dismiss into one for summary judgment.  The relevant inquiry is not whether plaintiffs have made a prima facie claim under section 1981, but whether there are no grounds for relief if all allegations made are assumed to be true.  Here, if all plaintiffs' factual assertions are true, it is not "beyond doubt that * * * plaintiff[s] can prove no set of facts in support of * * * [their] claim which would entitle * * * [them] to relief." <u>Lewis</u>, 87 F3d at 1545.

Accordingly, the City is not entitled to dismissal of plaintiffs' allegations of race discrimination under section 1981.


D

The City briefly argues that the court should dismiss plaintiffs' claim for declaratory relief because it is unripe and because it is identical to the claims raised in plaintiffs' claims for damages.  Doc #26 at 11.  In their opposition to the City's motion to dismiss, plaintiffs assert that the court has discretion to issue a declaration that the City's actions were unconstitutional in order to "send a strong message" to the City that it acted inappropriately.  Doc #24 at 11-12.

The court's prior discussion of ripeness, *supra* III(B), determines the outcome of this argument.  Indeed, in the motion and reply, the City's argument on declaratory judgment consists of

17

citation to its prior argument on ripeness.  Accordingly, the court

applies its prior reasoning and declines to dismiss plaintiffs'

declaratory judgment claim.


E

The City argues that plaintiffs' cause of action for

injunctive relief should be dismissed because plaintiffs' complaint

fails to demonstrate any irreparable injury.

In its August 17, 2006, order denying plaintiffs' ex parte

motion for a temporary restraining order (TRO), the court concluded

that plaintiffs had not presented sufficient evidence to support a

claim for provisional relief.  Doc #23 at 3.  In its reply

memorandum to the present motion, the City argues "[plaintiffs']

contentions have no greater purchase now than [in their motion for

TRO] * * *."  Doc #26 at 12.  While the record at the time of

plaintiffs' motion lacked sufficiency, the court did not indicate

that such a record could not exist.  Indeed, subsequent discovery

may reveal facts sufficient to support a claim for injunctive

relief.

Accordingly, the City's motion to dismiss plaintiffs'

claim for injunctive relief is DENIED.

//

//

//

//

//

//

//

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV

In sum, the court DENIES the City's motion to dismiss (Doc #20, 21).

IT IS SO ORDERED.

VAUGHN R WALKER

United States District Chief Judge